IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:20cr16-1 |
| | ) | |
| ERVIN DWAYNE LEGGETTE | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is Defendant Ervin Dwayne Leggette's motion to suppress statements made during his encounter with law enforcement. (Doc. 14.) The Government filed a response opposing the motion. (Doc. 16.) On October 13, 2020, the court held an evidentiary hearing on the motion. For the reasons set forth below, the motion will be denied.

**I. BACKGROUND**

At the evidentiary hearing, the Government presented the testimony of Sergeant Matthew Mulgrew and Officer Matthew Rochelle, both of the Winston-Salem Police Department. The Government also offered into evidence, without objection, video footage from Officer Rochelle's body camera on the night in question. The court finds the testimony of both officers to be credible and finds the following facts based on the preponderance of the evidence:

On April 24, 2019, at approximately 11:35 p.m., Officer Rochelle, who was on patrol, observed a white Subaru automobile in

the parking lot of Reynolds Park, a city-owned park in Winston-Salem. Because city parks close at 10:30 p.m., Officer Rochelle proceeded to investigate and radioed for back-up. The Subaru was unoccupied, so Officer Rochelle started walking down toward a picnic area in the park. He eventually came into contact with Leggette and a female, Deborah Marshall. Leggette and Marshall told Officer Rochelle they were just "hanging" out in the park. Officer Rochelle advised them the park was closed and that they were trespassing. All three started walking back toward the parking lot while Officer Rochelle gathered background information from Leggette and Marshall. Around this time Sergeant Mulgrew arrived in response to Officer Rochelle's request for back-up and began to survey the area. Within a minute or two, Sergeant Mulgrew discovered a firearm in a bag in an otherwise empty trashcan in the picnic area where Officer Rochelle, Leggette, and Marshall had just been. Sergeant Mulgrew radioed Officer Rochelle with instructions to "go ahead and pat him down. I found a gun down here."

Officer Rochelle frisked Leggette and did not find any further weapons or contraband. After the frisk, Officer Rochelle asked Leggette, "What's the gun over there for man? Be honest with me man. You were over there." Leggette denied having the firearm but volunteered to Officer Rochelle, "I just did 15 years." Officer Rochelle asked a second time, "Help me understand though why's

2

there a firearm down there?" Leggette again denied knowledge of the firearm, saying, "Like I said, I don't know where he got that firearm from." Officer Rochelle then said:

> Listen, we've been doing this long enough. There's no way. People don't come down here and leave firearms like that. So, just be honest with me. If you be [sic] honest with me, it's going to go a long way. Okay. Now, I know that it's hard to say that sometimes. Listen, you got to just be real with me. Why's there a firearm down there? There's a gun down there. I mean, he didn't just make that up. He didn't just bring a gun down and put it down there himself. He found it. So be real with me, man.

At this point, Leggette said, "I had the gun. Yeah, I had a gun. The gun is for protection." Officer Rochelle asked Leggette if he was allowed to own a gun, and Leggette replied no. Officer Rochelle then proceeded to handcuff Leggette and placed him in the back of his patrol car. The entire interaction, from Sergeant Mulgrew's direction to frisk Leggette until Leggette's placement in handcuffs lasted about two-and-one-half minutes. Officer Rochelle's questioning of Leggette about the firearm lasted about one-and-one-half minutes. As he was putting Leggette into his patrol car, Officer Rochelle asked, "What kind of gun is it? Never mind, don't worry about that. I'll ask you later."

Officer Rochelle transported Leggette to the Forsyth County Detention Center. There, he read Leggette his Miranda[1] warnings.

---

[1] Miranda v. Arizona, 384 U.S. 436, 444 (1966). Officer Rochelle did not have his Miranda card, so he asked another WSPD officer to send him a copy of the warnings, which Officer Rochelle then read to Leggette off his cellphone.

3

He asked Leggette if he understood the warnings and if he had anything he wanted to say. Leggette said he understood and was willing to speak to him. Leggette then told Officer Rochelle that he brought the firearm to the park and answered further questions about the gun.

## II. ANALYSIS

Leggette moves to suppress all statements made to Officer Rochelle. (Doc. 14 at 3-4.) He argues that he was "in custody" for purposes of Miranda when he was questioned in the park and therefore his statements admitting possession of the firearm should be suppressed because he did not receive his Miranda warnings. He further argues that his post-Miranda statements at the detention center should likewise be suppressed as impermissibly tainted by the park questioning.[2]

### A. Reynolds Park Statements

The Fourth Amendment to the United States Constitution provides in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. Not all police interactions rise to the level of a seizure

---

[2] In his motion, Leggette is not clear which statements he seeks to suppress. The motion focuses on the interaction at the park. However, Leggette also argues that the alleged Miranda violation "requir[es] suppression of all evidence obtained as a result of such illegality." (Doc. 14 at 3-4.) And at the suppression hearing, Leggette argued that the statements at the detention center should be suppressed as "fruit of the poisonous tree" of the initial Miranda violation.

4

within the meaning of the Fourth Amendment. "The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002) (internal citations omitted). The parties agree that the present case concerns the second category -- a Terry stop. See Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, a police officer can briefly detain a person and make limited inquiries, without it becoming an impermissible seizure, when the officer has a reasonable suspicion that criminal activity is afoot. Id. at 16, 30.

The Fifth Amendment to the United States Constitution protects against compelled self-incrimination. In order to protect this right, Miranda v. Arizona requires law enforcement officers to warn suspects of certain constitutional rights before interrogation once the suspect is "in custody." See 384 U.S. 436, 444-45 (1966). However, because a Terry detention is of a limited nature, the prophylactic protections afforded by Miranda are not automatically triggered. See United States v. Sullivan, 138 F.3d 126, 131 (4th Cir. 1998) (concluding that routine traffic stops "are analogous to Terry stops where no Miranda warnings are required"); United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir.

5

1995) ("Instead of being distinguished by the absence of any restriction of liberty, <u>Terry</u> stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." (citations omitted)). However, should a <u>Terry</u> stop exceed a permissible scope, such that the person detained is "in custody," <u>Miranda</u> warnings are required. <u>See</u> <u>United States v. Leong</u>, 116 F.3d 1474 (4th Cir. 1997) (per curiam) (unpublished opinion) (finding under the "narrow facts" of the case that a lawful investigative traffic stop "evolved into a custodial interrogation" when officers told occupants, who had been removed from the car and ordered to "squat and put their hands over their heads," they would be arrested unless they admitted who owned a firearm).[3]

The Government does not contest that Leggette was interrogated by Officer Rochelle at the park.[4]  It also acknowledges that Leggette was detained for purposes of <u>Terry</u> at least when Officer Rochelle proceeded to frisk and question Leggette about the firearm once Sergeant Mulgrew reported finding

---

[3] <u>Leong</u> is cited by the Government as contrary authority.  (Doc. 16 at 7.)  Unpublished decisions of the Fourth Circuit are not precedential and are generally accorded the weight of their persuasive reasoning. <u>See</u> <u>Collins v. Pond Creek Mining Co.</u>, 468 F.3d 213, 219 (4th Cir. 2006).

[4] <u>See, e.g.</u>, <u>United States v. Johnson</u>, 734 F.3d 270, 276 (4th Cir. 2013) (finding questioning to be interrogation where "police should know [it is] reasonably likely to elicit an incriminating response") (citing <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299-301 (1980)).

6

it.[5]  The question is whether Leggette was in custody at the time of his statements.

The Terry inquiry proceeds in two steps: first, "whether the police officer's action was justified at its inception" and, second, "whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop."  United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011), abrogated in part on other grounds, Rodriguez v. United States, 575 U.S. 348 (2015).  As to the first prong, there is no dispute that Officer Rochelle's actions were justified at their inception.  He was initially investigating a trespass, during which he saw an unoccupied car in a city park after hours and explored the park to determine if anyone was there.  Leggette does not challenge Officer Rochelle's right to detain him and perform a protective frisk upon discovery of the firearm.  See United States v. Robinson, 846 F.3d 694, 700 (4th Cir. 2017) (en banc) (upon a lawful stop, the officer can perform a protective frisk if the officer reasonably believes the person is armed and dangerous).

Under Terry's second prong, the seizure must be limited in both scope and duration.  Digiovanni, 650 F.3d at 507.  Regarding

---

[5] At the suppression hearing Leggette argued that he was detained from the moment the officers arrived at the park and started questioning him about the trespass.  This is doubtful.  Leggette and Marshall were trespassing after hours and had to return to their parked car anyway. But the distinction is immaterial, as there is no dispute that Leggette was detained when he was questioned about the firearm.

7

scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. (quoting Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion)). Regarding duration, the court looks to "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id.

During a Terry stop, the "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" without converting the stop into a custodial interrogation. See Berkemer v. McCarty, 468 U.S. 420, 439 (1984). An officer's questions during a Terry stop cannot prolong an otherwise lawful stop even if the extension is minimal. See Rodriguez, 575 U.S. at 354 (concluding in the traffic-stop context that "the tolerable duration of police inquiries . . . is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop and attend to related safety concerns" (citation omitted)). A concern for officer safety is of special importance. See United States v. Hensley, 469 U.S. 221, 235 (1985) (during a Terry stop officers can "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo").

8

But officer safety is not the only basis for questioning during a _Terry_ stop. The investigation during a _Terry_ stop also generally permits questioning "reasonably related in scope to the justification" for the stop itself. See _United States v. Brignoni-Ponce_, 422 U.S. 873, 881 (1975); accord 4 Search & Seizure § 9.2(f) (6th ed.) ("It is clear that there are several investigative techniques which may be utilized effectively in the course of a _Terry_-type stop. The most common is interrogation, which may include both a request for identification . . . and inquiry concerning the suspicious conduct of the person detained."). Thus, courts in this circuit have upheld limited questioning regarding the nature and circumstances of the stop as within the bounds of _Terry_ without requiring _Miranda_ warnings. See, e.g., _United States v. Gardner_, 823 F.3d 793, 801 (4th Cir. 2016), _abrogated in part on other grounds_, _Stokeling v. United States_, 139 S. Ct. 544 (2019) (asking suspect two times if he had anything illegal in his car did not turn a lawful traffic stop into a de facto arrest requiring _Miranda_ warnings because "the officers asked [the suspect] questions directly related to their reasonable suspicion that he had a firearm in his possession"); _Leshuk_, 65 F.3d at 1110 (no custody when officers observed defendants near a marijuana field, identified themselves as officers, told defendants they were investigating the field, frisked defendants but did not draw their weapons, and asked defendants questions about why they were there

9

and what was in their backpacks); <u>United States v. Palacio</u>, 427 F. Supp. 3d 662, 673 (D. Md. 2019) (after searching a passenger's backpack during a traffic stop, which revealed ammunition, a ski mask, and gloves, "follow up questions [were] within the scope of a <u>Terry</u> stop. Indeed, a certain amount of questioning during a <u>Terry</u> stop is contemplated and does not necessarily convert the encounter into a custodial interrogation."). This is consistent with courts in other circuits as well. <u>See, e.g.</u>, <u>United States v. Garcia</u>, 646 F.3d 1061, 1069 (8th Cir. 2011) (asking passenger suspected of drug activity for his phone number, which directly connected the passenger to a confidential informant and hence to the crime, was within the scope of <u>Terry</u> because such information was "reasonably related in scope to the circumstances that initially prompted the stop" (quotations and citation omitted)); <u>United States v. Davis</u>, 530 F.3d 1069, 1082 (9th Cir. 2008) (asking detainee "four or so questions . . . aimed at obtaining information to confirm or dispel [the officer's] suspicion that [the detainee] might be part of the marijuana growing operation" the officers were investigating was permissible under <u>Terry</u> and did not require <u>Miranda</u> warnings); <u>United States v. Lee</u>, 317 F.3d 26, 31 (1st Cir. 2003) (asking suspect "a series of questions" during investigation of attempted credit card fraud was within <u>Terry</u>'s confines, especially where questions brought to light new information that elevated suspicion); <u>United States v. Trueber</u>, 238 F.3d 79, 94

10

(1st Cir. 2001) (asking individual detained during a traffic stop who was suspected of drug smuggling questions "targeted at ascertaining [his] identity, his reasons for being in the country, and whether he was involved in the suspected illegal activity" was permissible within a lawful Terry stop and did not require Miranda warnings, especially where information gleaned during the stop warranted a more thorough investigation).

Here, Officer Rochelle's actions were within the permissible bounds of a Terry stop and did not require Miranda warnings. What began as a routine and perhaps relatively harmless trespass changed significantly when Officer Mulgrew discovered the firearm in a bag in an otherwise empty trashcan near where Leggette had been in a closed park. The presence of the firearm and the nature in which it was found, combined with the fact that Leggette and Marshall were the only two people observed in the closed park, certainly gave rise to a reasonable suspicion that the abandoned firearm belonged to either Leggette, Marshall, or even some third person who was yet detained. As the Government argued at the suppression hearing, these facts present a concern for officer safety, including the need to determine why the firearm was present and whether anyone else was in the park who was armed. Limited questions to this end are within the confines of Terry.

The entirety of the relevant portion of the interaction -- from when Officer Rochelle first asked, "What's the gun over there

11

for man?" to when Leggette admitted the firearm was his -- lasted one-and-a-half minutes. While some of the officer's bodycam video is muffled, it appears that Officer Rochelle asked Leggette a total of three direct questions about the firearm.[6] After the first question, Leggette volunteered to Officer Rochelle that he had recently served 15 years in prison. Cf. Lee, 317 F.3d at 31 (lawful Terry stop can be prolonged when "emergent developments . . . justif[y] the continued detention"). Officer Leggette's final question, while longer and more direct, falls within the realm of those found by other courts as not rising to the level of coercion or a threat so as to cross the threshold into custody requiring Miranda warnings. Cf. Leong, 116 F.3d at 1474. Officer Rochelle's tone was polite, he did not draw his weapon, and during the questioning Leggette was not handcuffed or otherwise constrained. The encounter took place outdoors beside Leggette's car. Cf. Leshuk, 65 F.3d at 1109-10 (noting that in certain circumstances, even "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes"). After handcuffing Leggette, Rochelle stopped questioning him about the firearm and did not resume until they were at the detention center and Leggette had been given his

---

[6] See supra pages 2-3.

_Miranda_ warnings.  In total, Rochelle's inquires did not exceed a "tolerable duration."  _See_ _Rodriguez_, 575 U.S. at 354.  The "mission" of the stop -- at least from the point when the firearm had been found -- was to ascertain why a gun was abandoned in a park trashcan and "attend to related safety concerns."  _See_ _id._ On these facts, Rochelle's questions did not exceed a permissible scope allowed in a _Terry_ stop.

Leggette contends that he was "in custody" for _Miranda_ purposes.  (Doc. 14 at 4-7.)  He argues that a person is "in custody" if under the circumstances "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  _Thompson v. Keohane_, 516 U.S. 99, 112 (1995).  While this is a correct statement of law, it suffers from two infirmities.  First, "[t]he 'custody' that implicates the _Miranda_ rule is conceptually distinct from a seizure implicating the Fourth Amendment."  _Sullivan_, 138 F.3d at 131.  In other words, under a valid _Terry_ stop, a person can be detained such that he would not feel free to leave and yet no _Miranda_ warnings are required (i.e., is not "in custody" for _Miranda_ purposes).

Second, being "in custody" for _Miranda_ requires more than merely not being at liberty to terminate the encounter and leave. "[T]he ultimate inquiry" is whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  _Keohane_, 516 U.S. at 112 (quotations and citation

13

omitted); _see also_ _United States v. Hashime_, 734 F.3d 278, 282 (4th Cir. 2013) (in deciding whether a defendant not under formal arrest is in custody, the court asks whether "under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest." (quotations, alterations, and citations omitted). This is an objective inquiry. _See_ _Berkemer_, 468 U.S. at 442 ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); _United States v. Parker_, 262 F.3d 415, 419 (4th Cir. 2001) ("Custody determinations . . . depend [on] the objective circumstances of the interrogation."). Relevant facts include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, [] whether there was any physical contact between the officer and the defendant," whether the suspect was isolated and separated, and any physical restrictions. _Hashime_, 734 F.3d at 283.

Examining the totality of the circumstances here, the court finds that Leggette was not in custody so as to require _Miranda_ warnings.

Although he was questioned at night in any otherwise empty park, it was nevertheless a public setting and in the presence of

14

another person (Mitchell). While Leggette was not at his home, nor was he at the police station; if anything, the park was a neutral setting. See United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) ("Courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings" (alterations, quotation, and citation omitted)). There were two officers present, but only one (Officer Rochelle) questioned Leggette; Sergeant Mulgrew was, for at least part of the inquiry, down by the trashcans where the firearm was found. At the suppression hearing, Leggette's counsel pointed to the fact that both officers were in uniform with their service weapons visible. However, "[t]he mere presence of armed law enforcement officers during the interview is not sufficient to create a custodial situation." United States v. Hargrove, 625 F.3d 170, 179 (4th Cir. 2010) (finding no custody, in part, where defendant was not handcuffed during interview, agents did not draw their weapons, and the conversation was non-threatening). As in Hargrove, Leggette was not handcuffed or otherwise physically restricted, the officers did not draw their weapons, and Officer Rochelle's tone was non-threatening.

It is true that if an interviewee is expressly told he is free to leave, that is "highly probative" of whether a reasonable person would believe he is in custody. See Hargrove, 625 F.3d at 180. However, such a statement is not "talismanic." See

15

id.  Moreover, the situation here involves a Terry stop, which entails circumstances that are different from the typical Miranda custodial inquiry.  As discussed above, Terry stops are seizures under the Fourth Amendment such that a person is usually not free to leave, and yet such a situation does not generally "exert[] upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights."  See Berkemer, 468 U.S. at 437 (explaining why Miranda warnings are not required during routine traffic stops and expressly comparing traffic stops to Terry stops).  This is because Terry stops are presumptively temporary and brief and the circumstances surrounding them "are not such that the [detainee] feels completely at the mercy of the police."  See id. at 437-38.  In other words, even though Leggette was not told he was free to leave, and even though he was not free to leave at the moment, this did not convert an otherwise lawful Terry stop into a custodial situation so as to require Miranda warnings.[7]

_____

[7] Hashime is not to the contrary.  While the court noted the officer's statement "I need you to be completely honest with me . . . I need to know the truth," it was partly in the context of rebutting the Government's argument that the defendant was not in custody because the agents told the defendant that he was free to leave.  734 F.3d at 283-84.  Moreover, the agents had made other statements such as "I can't leave you here with nobody here" and "we got to kind of keep an eye on you" during what was a 3-hour interrogation after the defendant had been awakened at gunpoint by 15 to 30 state and federal agents and isolated from his family.  Id.

16

Based on the totality of the circumstances -- including the after-hours trespass in an otherwise empty park and the presence of the firearm found in the park trashcan -- Officer Rochelle was permitted to briefly detain Leggette and ask a "moderate number of questions . . . to try to obtain information confirming or dispelling the officer's suspicions" surrounding the unexplained presence of a firearm seemingly abandoned in the area where Leggette had just been.  See Gardner, 823 F.3d at 801 (quoting Berkemer, 468 U.S. at 439).  This is especially so given that at the outset of the questioning about the firearm Leggette volunteered that he was a felon who had served 15 years in prison. Leggette was not restrained anywhere near the degree associated with a formal arrest.  He was questioned in a public park in the presence of others, he was not handcuffed or physically restricted, no weapons were drawn, and Officer Rochelle's questioning was brief and non-threatening.  The interaction remained within the permissible confines of Terry, and Leggette was not "in custody" during questioning as to require Miranda warnings.

### B.  Forsyth County Detention Center Statements

The Government argues alternatively that even if the initial interaction in the park exceeded the confines of Terry, Leggette's statements at the Forsyth County Detention Center should not be suppressed.

"A subsequent administration of Miranda warnings to a suspect

17

who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Oregon v. Elstad, 470 U.S. 298, 314 (1985)). The inquiry turns on voluntariness.[8] The first, unwarned statement must be voluntary, i.e., not the result of "coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him." See id. at 317.[9] So, too, must the second statement, made after the warnings, be voluntary. Id.

The Government bears the burden of proving by a preponderance of the evidence that a statement was voluntary. United States v.

_____

[8] At the evidentiary hearing, Leggette argued that his second statement made at the detention center should be excluded as "fruit of the poisonous tree." However, this conflates the Fourth Amendment with the Miranda prophylactic. A confession obtained as a result of a violation of the Fourth Amendment, e.g., after an illegal arrest, should be excluded as fruit of the poisonous tree "unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." Taylor v. Alabama, 457 U.S. 687, 690 (1982) (citation omitted). In contrast, "a simple failure to administer [Miranda] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" cannot be said to "so taint[] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Elstad, 470 U.S. at 309. In other words, the "fruit of the poisonous tree" doctrine does not apply to Miranda violations. See United States v. Patane, 542 U.S. 630, 642 (2004) (plurality opinion).

[9] For example, police cannot deliberately withhold Miranda warnings until obtaining a confession, and then immediately give the warnings to obtain a second confession. See Missouri v. Seibert, 542 U.S. 600 (2004).

Braxton, 112 F.3d 777, 781 (4th Cir. 1997) (en banc). "A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause. . . . The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." Id. at 780 (citations and quotations omitted). To determine this, "courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Id. at 781. Certain threats or promises can be coercive. See United States v. Shears, 762 F.2d 397, 402 n. 5 (4th Cir. 1985) (finding that a promise that all charges would be dropped rendered confession involuntary). However, "truthful statements about the defendant's predicament are not the type of 'coercion' that threatens to render a statement involuntary." Braxton, 112 F.3d at 782 (alterations and citation omitted). To be sure, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it," even though statements made may be voluntary. Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (noting that "a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment'").

19

Here, Leggette's statements were voluntary. As to the first, unwarned statements in the park, the nature and circumstances of the interrogation do not suggest Leggette's "will [was] overborne or his capacity for self-determination critically impaired." See Braxton, 112 F.3d at 780. The tone was conversational and non-threatening. While Officer Rochelle did tell Leggette that his cooperation would "go a long way," this is far from the type of threat or promise that courts have found rises to the level of coercion. See United States v. Whitfield, 695 F.3d 288, 302 (4th Cir. 2012) (noting that even "misrepresentations are insufficient, in and of themselves, to render a confession involuntary" (citation omitted)); United States v. Byers, 649 F.3d 197, 216 (4th Cir. 2011) (officer's equivocal statement about whether defendant would be charged for murder did not render defendant's statements involuntary); Braxton, 112 F.3d at 782–83 (investigator's statement "that you can do five years because you're not coming clean" did not result in involuntary confession); Shears, 762 F.2d at 401 n. 2 (citing cases where agent statements did not render a confession involuntary, such as suggesting that the defendant should "try to help himself," telling the defendant that he could help himself out by cooperating, and promising that cooperation would be relayed to the court). Viewed from the perspective of the Defendant, Grades v. Boles, 398 F.2d 409, 412 (4th Cir. 1968), such a vague statement that Leggette's cooperation would "go a

20

long way" is not the kind that would render the response involuntary. Moreover, the encounter, though at night in an otherwise empty park, was in a public place and there was at least one other witness, Mitchell. Cf. United States v. Giddins, 858 F.3d 870, 885 (4th Cir. 2017) (suspect brought alone and under false pretenses to an interrogation room rendered Miranda waiver involuntary). Leggette was 37 years old at the time and had prior experience with law enforcement.

As to the second statement at the detention center, Officer Rochelle's video from his bodycam establishes that this occurred after he read Leggette his Miranda rights and that Leggette understood and expressly waived them. Specifically, Officer Rochelle asked Leggette, "Do you understand what I just said? Do you need me to read them to you again?" Leggette replied, "No, I understand." Officer Rochelle said, "Great. And are you willing to talk to me?" to which Leggette responded, "Yeah, I'll talk to you." The court finds this to be a clear waiver of his rights. See Berghuis v. Thompkins, 560 U.S. 370, 384 (2010) (a Miranda waiver can be either express or implied so long as the government shows the warnings were given and understood and the defendant made an uncoerced statement).

In sum, even if Leggette's statements in the park were inadmissible because he was "in custody" and had not received Miranda warnings, the court finds that his statements at the

detention center are admissible because they were made voluntarily after he received and waived his warnings and were not tainted by his earlier statements.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendant's motion to suppress (Doc. 14) is DENIED.

                                    /s/   Thomas D. Schroeder
                              United States District Judge

October 26, 2020